UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

TARA JARRELL                                        CIVIL ACTION

VERSUS                                              NUMBER: 17-05534

NANCY A BERRYHILL, ACTING                           SECTION: "J"(5)
COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION

## REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2(B), this matter comes before the Court on the parties' cross-motions for summary judgment following a decision of the Commissioner of the Social Security Administration denying Plaintiff's applications for Disability Insurance Benefits ("DIB") and for Supplemental Security Income ("SSI") benefits based upon disability.  (Rec. docs. 16, 17).

Tara Jarrell, Plaintiff herein, filed the subject applications for DIB and SSI benefits in June of 2014, alleging disability as of January 14, 2014.[1/]  (Tr. pp. 117-123).  In a "Disability Report – Adult" form that appears in the administrative record below, the condition limiting Plaintiff's ability to work was identified as neuropathy.  (Tr. p. 158).  Plaintiff's applications for Social Security benefits were denied at the initial level of the Commissioner's administrative review process on April 9, 2015.  (Tr. pp. 54-60, 61-67, 68, 69, 73-77).  Pursuant to Plaintiff's request, a hearing de novo before an Administrative Law Judge ("ALJ") went forward on July 12, 2016 at which Plaintiff, who was represented by counsel, and a

---

[1/] Although the administrative record before the Court does not contain a copy of Plaintiff's application for SSI benefits, it does contain documents evidencing the denial of that application (tr. pp. 54-60, 68, 73-77) and the Administrative Law Judge made mention of the application and that denial in the written decision that was issued in this matter on August 18, 2016.  (Tr. pp. 8-25).

Vocational Expert ("VE") appeared and testified.  (Tr. pp. 82-83, 84-86, 26-53).  On August 18, 2016, the ALJ issued a written decision in which she concluded that Plaintiff was not disabled within the meaning of the Social Security Act.  (Tr. pp. 8-25).  The Appeals Council ("AC") subsequently denied Plaintiff's request for review of the ALJ's decision on April 7, 2017, thus making the ALJ's decision the final decision of the Commissioner.  (Tr. pp. 1-4).  It is from that unfavorable decision that the Plaintiff seeks judicial review pursuant to 42 U.S.C. §§405(g) and 1383(c)(3).

In her cross-motion for summary judgment, Plaintiff frames the issues for judicial review as follows:

I.      THE COMMISSIONER DID NOT APPLY THE CORRECT LEGAL STANDARD WHEN ASSESSING PLAINTIFF'S RESIDUAL FUNCTIONAL CAPACITY AND THAT FINDING IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE.

II.     THE COMMISSIONER ERRED BY FAILING TO APPLY THE PROPER LEGAL STANDARD TO DETERMINE PLAINTIFF'S CREDIBILITY REGARDING PAIN AND OTHER SYMPTOMS.

(Rec. doc. 16-2, p. 5).

Relevant to the issues to be decided by the Court are the following findings that were made by the ALJ:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2018.

2.  The claimant has not engaged in substantial gainful activity since January 14, 2014, the alleged onset (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.  The claimant has the following severe impairments:  peripheral neuropathy (bilateral lower extremities); obesity; affective disorder (depressive disorder with psychotic features); and anxiety-related disorder (history of post-traumatic stress disorder)(20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can occasionally climb ramps or stairs; occasionally balance, stoop, kneel, crouch or crawl but should avoid concentrated exposure to uneven terrain.  In addition, she would be limited to the performance of work tasks that are simple, routine and repetitive.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on April 17, 1977 and was 36 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from January 14, 2014, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Judicial review of the Commissioner's decision to deny DIB or SSI benefits is limited

under 42 U.S.C. §405(g) to two inquiries:  (1) whether substantial evidence of record

supports the Commissioner's decision and (2) whether the decision comports with relevant legal standards. *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992); *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987). If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed. 42 U.S.C. §405(g); *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420 (1970). A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988). Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Jones v. Heckler*, 702 F.2d 616, 620 (5th Cir. 1983). The Court may not reweigh the evidence or try the issues *de novo*, nor may it substitute its judgment for that of the Commissioner. *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985). Conflicts in the evidence are for the Commissioner to resolve, not the courts. *Patton v. Schweiker*, 697 F.2d 590, 592 (5th Cir. 1983).

A claimant seeking DIB or SSI benefits bears the burden of proving that she is disabled within the meaning of the Social Security Act. *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which...has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§423(d)(1)(A) and 1382c(a)(3)(A). Once the claimant carries her initial burden, the Commissioner then bears the burden of establishing that the claimant is capable of performing substantial gainful activity and is, therefore, not disabled. *Harrell*, 862 F.2d at

475.  In making this determination, the Commissioner uses the five-step sequential analysis set forth in 20 C.F.R. §§404.1520 and 416.920, as follows:

1.  An individual who is working and engaging in substantial gainful activity will not be found to be disabled regardless of the medical findings;

2.  An individual who does not have a "severe impairment" will not be found to be disabled;

3.  An individual who meets or equals a listed impairment in Appendix 1 of the Regulations will be considered disabled without consideration of vocational factors;

4.  If an individual is capable of performing the work that she has done in the past, a finding of "not disabled" must be made; and,

5.  If an individual's impairment precludes her from performing her past work, other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if other work can be performed.

On the first four steps of the analysis, the claimant bears the initial burden of proving that she is disabled and must ultimately demonstrate that she is unable to perform the work that she has done in the past.  *Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5, 107 S.Ct. 2287, 2294 n. 5 (1987).  If the analysis reaches the fifth step, the ALJ may establish that other work is available that the claimant can perform by relying on expert vocational testimony or other similar evidence to establish that such jobs exist.  *Fraga*, 810 F.2d at 1304 (citing *Lawler v. Heckler*, 761 F.2d 195, 198 (5th Cir. 1985)).  Once the Commissioner demonstrates that the individual can perform other work, the burden then shifts back to the claimant to rebut that finding.  *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988); *Fraga*, 810 F.2d at 1302.

The documentary evidence generated during the relevant time period[2/] begins with records from the University Medical Center – New Orleans ("UMCNO") Emergency Department dated September 26, 2014 where Plaintiff presented and was treated for a labial abscess.  (Tr. pp. 307-316).

On October 10, 2014, Plaintiff completed the Administration's "Function Report-Adult" form that is designed to elicit information about how her condition limited her activities.  There, Plaintiff indicated that left leg pain rendered her unable to stand or to sit for long periods of time and limited the hours that she was then able to work.  On a typical day, Plaintiff would rise and see her children off to school and would then either return to bed, get dressed for work if scheduled to do so, or perform light household chores.  Plaintiff assisted her children with their personal needs or homework and her husband would shuttle them back and forth to school if she was in too much pain to drive.  Plaintiff explained that if she had been at work all day, her legs would begin to throb and would require medication just to sleep.  She was still able to cook daily, do laundry, wash dishes, and do light cleaning around the house but could not stand at the stove for lengthy periods of time as she once did.  Plaintiff was also able to drive a car, go out alone, and shop online and in stores as needed.  She could also tend to all financial matters.  Personal interests included computer games and family activities that did not involve excessive walking and were short in duration.  When asked to list the places that she went to on a regular basis, Plaintiff identified work but she was unable to endure the sitting required to attend church or to keep up with all of her

---

[2/] Under 20 C.F.R. §§404.1512(d) and 416.912(d), the Commissioner is charged with developing the medical history of a DIB/SSI claimant "… for at least the 12 months preceding the month in which you file your application … unless you say that your disability began less than 12 months before you filed your application." As Plaintiff filed her applications for Social Security benefits in June of 2014 but alleged an onset of disability less than 12 months earlier beginning on January 14, 2014, the relevant time begins with the latter date.

children's activities.  Plaintiff indicated that her leg would become numb or painful upon bending, kneeling, sitting, standing, or walking for long periods of time.  She estimated that she could walk up to two blocks before needing to rest for 10 to 15 minutes, could pay attention for one hour, and could follow instructions that sometimes needed to be repeated. Plaintiff also reported pain to the heels of her feet and shooting pain in the hips if climbing more than two flights of stairs.  The Neurontin that had been prescribed to her caused grogginess and sleepiness.  (Tr. pp. 178-185).

Plaintiff was next seen at the Daughters of Charity Medical Center on February 4, 2015 for gynecological-related issues.  Upon physical examination, the musculoskeletal system was normal, no sensory abnormalities were noted, and reflexes were normal.  The assessment was irregularly lengthy periods and obesity.  Naproxen was prescribed and follow-up testing was ordered.  (Tr. pp. 298-300).  On March 6, 2015, Plaintiff underwent a consultative physical examination by Dr. Walter Ellis.  The major complaint was peripheral neuropathy.  Also notable was a history of motor vehicular accidents causing whiplash injuries and gestational diabetes when carrying her last child seven years earlier.  Plaintiff related being followed by Drs. Hoang and Trahan for her primary medical issue, the latter of whom had conducted an EMG of the lower extremities which revealed a primarily sensory-type mild polyneuropathy affecting both legs.  Plaintiff was still independent in the activities of daily living without assistive devices but she advised the doctor that she had stopped working in December of 2014 secondary to pain.  Physical examination findings revealed a normal range of motion of the neck and back, negative straight leg raising bilaterally, and a reciprocal gait requiring no assistive devices.  Plaintiff had a decreased range of motion of the left ankle and some tenderness to palpation around the left lateral ankle area.

Neurologically, cranial nerves II and XII were intact bilaterally and muscle tone, bulk, and strength were preserved in all four extremities. All modalities of sensation were intact as were deep tendon reflexes. As part of the evaluation, Dr. Ellis reviewed the results of a prior nerve conduction study from 2009 that revealed a mild peripheral polyneuropathy, primarily of a sensory type, and previous x-rays of the knee that were normal. The diagnosis was mild peripheral polyneuropathy as described and left ankle pain of unknown etiology. Despite ambulating with an antalgic gait, Plaintiff required no assistive devices; cardiovascular, spine, and back exams were normal; and, there was a decreased range of motion of the left ankle but with no swelling and normal x-ray studies of that extremity. (Tr. pp. 248-253).

Plaintiff received follow-up care for her gynecological issues at the Daughters of Charity Medical Center on April 8, 2015. The assessment was pelvic pain; further testing was ordered. (Tr. pp. 280-284). Plaintiff underwent an ultrasound on April 27, 2015 which produced normal results. (Tr. p. 296). She returned to Daughters of Charity to obtain the test results on May 11, 2015 and was prescribed Anaprox as needed. (Tr. pp. 295-296). Plaintiff was next seen at UMCNO on August 7, 2015 for complaints of lower back and abdominal pain related to gynecological issues for two years. The assessment was endometriosis and Plaintiff was prescribed Ortho-Cyclen. Further ultrasound studies were to be scheduled. (Tr. pp. 317-319). Plaintiff returned to the Daughters of Charity Clinic on September 17, 2015 for complaints of left leg pain and flu-like symptoms. The assessment was an upper respiratory virus and neuralgia of the left lower extremity. Plaintiff was administered a Depo Medrol injection and was prescribed antibiotics. (Tr. pp. 293-295). The aforementioned ultrasound was performed on November 2, 2015 and produced

unremarkable results.  (Tr. pp. 320-321).  At a follow-up visit to UMCNO three days later, Plaintiff related that the Neurontin which had been prescribed by her primary care physician made her feel like she was having an "out of body experience."  A physical examination revealed the extremities to be normal and atraumatic with no cyanosis or edema.  The assessment was endometriosis.  Diagnostic laparoscopy was discussed if Plaintiff's pain did not improve.  (Tr. pp. 323-325).

Plaintiff was seen again at Daughters of Charity on December 18, 2015 for complaints of left knee and leg pain after a vehicle drove into the side of her two-story house two days earlier and she was thrown from the impact.  There was swelling of the thigh along with muscle tightness upon palpation and tenderness on ambulation.  There was also tenderness on palpation of the left knee.  Limping was observed but sensory and motor examinations were normal as were reflexes.  The assessment was osteoarthritis.  Pain medication was prescribed.  (Tr. pp. 292-293).  Plaintiff was subsequently seen at UMCNO for similar symptoms on December 22, 2015 but x-rays of the left knee revealed no evidence of acute abnormality.  (Tr. pp. 326-327).

On January 6, 2016, Plaintiff was evaluated at the Access Central City Behavioral Health Center for complaints of feeling depressed and angry, frequent angry outbursts, and marital conflict/lack of sexual desire due to flashbacks of childhood abuse and allegations of recent familial sexual improprieties.  Plaintiff also reported neuropathy/pain in the right leg and a history of other issues as a child.  On mental status examination, Plaintiff had a cooperative attitude, normal speech, and an appropriate affect but her mood was irritable, depressed, and anxious and her thought process was rambling.  She was oriented x4 but concentration, judgment, and impulse control were impaired.  The diagnosis was major

depressive disorder, recurrent and severe, but without psychotic features.   Medication management and outpatient therapy were recommended.  (Tr. pp. 371-381).

Plaintiff presented to the TeamCare Medical Center on January 8, 2016 for further evaluation and treatment of the vehicle-related accident noted earlier as her pain continued and she was having difficulty walking.   The diagnosis was a contusion to the left knee, a sprained ligament in the left ankle, and pain in the left hip.   Conservative treatment was begun consisting of electrical stimulation, cryo/hydroc packs, massage, myofacial release, mechanical traction, and ultrasound.  A prognosis was withheld pending Plaintiff's response to the treatment.  (Tr. pp. 359-364).

On January 19, 2016, Plaintiff was seen by Dr. Danita Anderson for complaints of elevated blood pressure.  (Tr. p. 437).  She was seen again by Dr. Anderson on February 1, 2016 for complaints of flu-like symptoms of three days' duration.  A physical examination produced unremarkable results.  The assessment was an upper respiratory virus and various medications were prescribed.  (Tr. pp. 475-476).  Plaintiff presented to UMCNO again on February 8, 2016 with complaints of left upper and lower extremity paresthesia which had started in 2008 and had become progressively worse, causing significant difficulty walking and requiring multiple pillows under her leg to be comfortable when sleeping.  The pain was described as pins and needles that started in the finger tips and toes which then became numb, resulting in an inability to stand or sit for extended periods of time.  In the attending physician's narrative, he noted that Plaintiff had a past medical history of neuropathy but that she did not have "... any pertinent problems on file."  A physical examination was largely unremarkable.  The assessment was paresthesia of the left arm and leg.  An MRI of the

10

cervical spine was to be scheduled and Plaintiff was re-started on Neurontin. (Tr. pp. 440-448).

Plaintiff was re-evaluated at the TeamCare Medical Center on February 19, 2016 for left hip, knee, and ankle strain/sprain/pain. Plaintiff was treated and was to return in four weeks. (Tr. p. 357). On February 26, 2016, Timothy Kern, a Doctor of Chiropractic ("DC") with the TeamCare Medical Center, recommended an MRI of Plaintiff's left knee to better diagnose knee contusion versus ligament pathology. (Tr. p. 358). By correspondence dated March 4, 2016, Dr. Robert Kelly of TeamCare provided Plaintiff's accident-related attorney with an update on Plaintiff's condition and the plan to continue physio-therapy with DC Kern to alleviate her symptoms. (Tr. pp. 355-356).

Plaintiff underwent an eye examination on March 16, 2016. (Tr. p. 389). She was re-evaluated by Dr. Kelly on March 18, 2016 for her ongoing complaints of left hip, knee, and ankle pain. By that date an MRI had apparently been performed which revealed some persisting edema in the knee. The sole physical examination finding was a reduced range of motion to the left knee. The diagnosis was left hip, knee, and ankle contusion; medications at the time included Neurontin, Seroquel, Trileptal, and Cymbalta. In the doctor's brief note he indicated that Plaintiff was at that time unable to work. Treatment to Plaintiff's knee was to continue and she was to be re-evaluated in four weeks. (Tr. p. 346). On the same day, DC Kern communicated the recent MRI results to Plaintiff's attorney and recommended an orthopedic evaluation to better diagnose her knee condition. (Tr. pp. 347-348). An interim report to Plaintiff's attorney was generated by Dr. Kelly on March 21, 2016 who advised that physio-therapy treatments and medications were helping to relieve her symptoms despite ongoing left hip and ankle pain. (Tr. pp. 344-345).

Plaintiff returned to UMCNO for follow-up care of her dysmenorrhea on March 24, 2016. Medication management of that condition and Plaintiff's bipolar disorder and neuropathy were continued. The assessment was endometriosis and pelvic pain. Alternative medical options were discussed. (Tr. pp. 449-456). Another eye examination went forward on March 31, 2016 and surgery was to be scheduled. (Tr. p. 388). On April 11, 2016, Plaintiff underwent an MRI of the cervical spine that revealed mild diffuse congenital narrowing of the spinal cord which, in combination with mild spondylosis, caused minimal to mild canal stenosis, most pronounced at C3-4. There was also a Type I endplate change at C4-5 with a posterior annular fissure. (Tr. pp. 457-462). On April 15, 2016, DC Kern corresponded with Plaintiff's accident-related attorney and provided a discharge narrative report, stating that Plaintiff had discontinued treatment with TeamCare on April 6, 2016 after achieving "markedly decreased" discomfort in the left knee, hip, and ankle. An invoice for services rendered accompanied the narrative report. (Tr. pp. 349-354).

On April 18, 2016, Plaintiff was seen at the New Orleans East Behavioral Health Center. In the treatment note from that date reference is made to an earlier psychiatric evaluation on February 3, 2016 at which Plaintiff was diagnosed with major depressive disorder, psychosis, and PTSD and was started on Cymbalta, Seroquel, and Trileptal. Despite feeling calmer on the medications, Plaintiff did experience side effects in the form of grogginess, a decreased appetite, and some hair loss. Plaintiff reported a history of episodes of overspending, increased activity, inability to finish tasks, racing thoughts, a decreased need for sleep, an elevated mood, and manic episodes. However, depressive episodes were denied since starting on medication. On mental status examination, Plaintiff was oriented x4 and was alert, had good eye contact, normal motor skills, and an appropriate affect. The

impression was bipolar II disorder, most recent episode mixed, and PTSD. Plaintiff was continued on her medication regimen given the "much improvement" that was achieved over the previous two months. (Tr. pp. 366-370).

Plaintiff was seen by a licensed professional counselor on May 2, 2016 and reported that she was to undergo surgery in two weeks. She declined to participate in the Smoking Cessation Program, having reduced her cigarette consumption from three packs per day to one pack per day. There were no violent or self-damaging behaviors reported and no suicidal or homicidal ideations. The assessment was nicotine dependence. (Tr. pp. 464-466). Plaintiff subsequently underwent eye surgery as scheduled on May 16, 2016. (Tr. pp. 382-383). A follow-up eye appointment went forward on May 24, 2016 and Plaintiff was said to be doing well. (Tr. p. 387).

As noted earlier, a hearing *de novo* before an ALJ went forward on July 12, 2016. After the documentary exhibits were formally admitted into evidence, Plaintiff's attorney waived an opening statement in light of the pre-hearing brief that he had submitted. Plaintiff then took the stand and was questioned by her attorney. She was 39 years of age at the time, had completed two years of vocational college as a dental assistant, and had last worked at Domino's as a delivery driver/team leader. She left the latter job on December 28, 2014 because of an inability to lift without experiencing pain in her arms or legs and swelling around the ankles. Plaintiff then clarified that it was her entire left side that was affected, having been diagnosed with neuropathy several years earlier which had started to spread. A subsequent MRI revealed two bulging discs in the neck which were pressing into the nerves in her spine and causing the neuropathy to migrate into her entire left side. Other severe medical problems included bipolar disorder which was controlled if she took her

13

medication but caused her to go into a manic, depressive state when she was not medication compliant. She also testified to suffering from an anxiety-based sleep disorder for which she had been prescribed medication for but had discontinued due to weight gain.

When asked by her attorney if her medications caused any side effects, Plaintiff answered in the affirmative, testifying that she became disoriented, sleepy, and groggy such that she could not drive and that she suffered from tremors so bad that she could not even move and thus spent the entire day in bed. Upon questioning by the ALJ, Plaintiff admitted to possessing a driver's license and driving as recently as the previous day to meet with her attorney because no one else would transport her there. Plaintiff also acknowledged abstaining from taking her medications on the days that she would have to drive, resulting in a deterioration of her mental state. After being tendered back to her attorney, Plaintiff testified that she had brought the medication side effects to the attention of her doctor and that her bipolar and neuropathy medications interacted and caused her to sleep 14 hours at a time. When under stress, Plaintiff experienced suicidal thoughts and became hostile, combative, and manic. Plaintiff had attempted suicide via an overdose of Tylenol at the age of 17 after having her first child and suffered hearing loss as a result. When asked about her PTSD, Plaintiff testified in some detail to a history of abuse and personal tragedies in her childhood years. She was attending counseling every two to three months. Medication interactions had been noticed in the previous few months, including hair loss. Plaintiff testified to lapses in concentration and experiencing racing thoughts. She tended to go grocery shopping in the wee hours of the morning to avoid long lines. In response to her attorney's questioning, Plaintiff testified that she could stand for 20 minutes at a time and walk for a block and a half before experiencing pain. Stair climbing was greatly problematic

14

for the left leg.  In terms of lifting, Plaintiff testified that she could at one time bench-press 220 pounds but could no longer lift a two-pound purse with her left arm.  Sitting caused her leg to become stiff with pain radiating from the toes up into the buttocks.  During the course of a normal day, Plaintiff estimated that she spent six to eight hours lying down as it was simply more comfortable and allowed her to take her medications.  (Tr. pp. 30-42).

Upon further questioning by the ALJ, Plaintiff testified that she had not received inpatient mental health treatment in the previous 15 years.  In addition to her suicide attempt as a teenager, Plaintiff related an incident that allegedly occurred four months earlier in which she became involved in a conflict with her in-laws over a dog and had attempted to overdose by taking a cocktail of medications.  Owing to the intervention of a friend, Plaintiff learned that she functioned much more appropriately if she took her prescribed medications properly.  (Tr. pp. 42-43).

Deborah Robichaux, a VE, was the next witness to take the stand.  After clarifying certain details concerning the various jobs Plaintiff had identified in her "Work History Report,"[3/] Robichaux classified the exertional and skill demands of Plaintiff's past work, as follows:  delivery team leader – light to medium with an SVP of 2, 3, or 5; assistant manager – light with an SVP of 7; salesperson – light with an SVP of 3; bakery sales clerk – light with an SVP of 3; self-service store stock clerk – heavy with an SVP of 4; home caregiver – medium with an SVP of 3; and, retail cashier/stocker – light with an SVP of 3.  The ALJ then posed a hypothetical question to Robichaux that assumed an individual of Plaintiff's age, education, and work experience who retained the residual functional capacity to perform light work that involved no climbing of ladders, ropes, or scaffolds; only occasional climbing of ramps

[3/] *See* tr. pp. 165-174.

or stairs; occasional balancing, stooping, crouching, kneeling, or crawling; and required the avoidance of concentrated exposure to uneven terrain.  With that profile in mind, the VE testified that the described individual could perform Plaintiff's past jobs as a cashier, salesperson, bakery sales clerk, and assistant manager, all light-level positions.  Other jobs of the same exertional level that the hypothetical individual could perform included order caller, silver wrapper, and fast food worker, with significant numbers of such positions existing in the national economy.  (Tr. pp. 44-48).

The ALJ then posed a second hypothetical question to Robichaux which assumed an individual who had all of the limitations that were set forth in the first hypothetical but the individual would additionally be limited to work involving only simple, routine, and repetitive tasks.  With the second hypothetical question in mind, the VE testified that the described individual would be unable to perform Plaintiff's past work.  However, the individual could still perform the three other alternative jobs that she had previously identified.  For the third hypothetical, the ALJ combined all of the limitations that were in the first two but the work was a "low stress" job, defined as that which had only occasional changes in the work setting.  Faced with that profile, the VE testified that the job of silver wrapper could still be performed.  The ALJ's fourth and final hypothetical question to the VE combined all of the limitations that were in the first three but the individual could only sustain sufficient concentration, persistence, or pace for six hours out of an eight-hour workday secondary to pain.  Given that added limitation, the VE testified that there would be no jobs that the individual could perform.  (Tr. pp. 48-51).

VE Robichaux was then tendered to Plaintiff's counsel for further questioning. Through a series of queries, the VE testified that if an individual was off-task more than 10%

of the time, there would be no full-time employment that he or she could maintain.  Similarly, if the individual had a moderate inability to concentrate, defined as a deficit of 50% on a given day, there would be no work that could be performed.  In closing, counsel argued that Plaintiff suffered from a combination of physical and emotional problems which rendered her unable to perform any work.  (Tr. pp. 51-53).  After considering the documentary and testimonial evidence of record, the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act.

Plaintiff challenges the Commissioner's decision to deny her Social Security benefits on two grounds.  First, Plaintiff argues that the ALJ did not apply the correct legal standard when assessing her residual functional capacity ("RFC") and that the ALJ's finding in that regard is thus unsupported by substantial evidence.  More specifically, Plaintiff argues that the ALJ failed to evaluate all of the medical evidence of record by improperly discounting the multi-year history of chronic pain and fatigue resulting from her neuropathy; by failing to factor into her RFC assessment several mental disorders with "significant psychiatric symptoms" that were diagnosed by Dr. Biswas; and by relying upon only x-rays and stale EMG results and failing to discuss or evaluate MRI findings, ongoing pain management, or any records whatsoever from an exhibit admitted in the proceedings below as no. 17F, all in violation of Social Security Ruling ("SSR") 96-8p.  (Rec. doc. 16-2, pp. 6-9).  For the reasons that follow, the Court believes that the Plaintiff's first challenge does not provide a basis to set aside the Commissioner's decision.

The Court notes first that despite alleging disability as of January 14, 2014, Plaintiff continued to work on at least a part-time basis up until she completed the Function Report on October 10, 2014.  The Court further notes that the only condition that Plaintiff identified

as a disabling one in her applications for Social Security benefits and related paperwork was neuropathy. (Tr. p. 158). She did not identify as a disabling condition any mental impairment(s) that limited her ability to work. *Guerin v. Shalala*, 29 F.3d 623, 1994 WL 395077 at *4 (5th Cir. 1994)(table)(citing *Pierre v. Sullivan*, 884 F.2d 799, 802 (5th Cir. 1989)). Despite that omission, at step two of the §§404.1520/416.920 analysis, the ALJ found that Plaintiff suffered from severe impairments in the form of peripheral neuropathy in the lower extremities, obesity, affective disorder (depressive disorder with psychotic features), and anxiety-related disorder (history of PTSD). At step three, the ALJ found that the foregoing impairments, while severe, did not meet or equal the criteria of any of those set forth in the listing of Impairments. Plaintiff does not challenge the ALJ's step two or three findings here. Having made these findings, the Regulations mandated that the ALJ make an assessment of Plaintiff's RFC, a term of art that embraces a claimant's ability to work despite her physical and/or mental impairments. 20 C.F.R. §§404.1520(e), 404.1545, 416.920(e), 416.945; *Hollis v. Bowen*, 837 F.2d 1378, 1386-87 (5th Cir. 1988). Just like the ultimate decision of whether a claimant is disabled, the responsibility for determining a claimant's RFC is reserved to the Commissioner and at the hearing level, that assessment is entrusted to the ALJ. 20 C.F.R. §§404.1527(e)(2), 404.1546(c), 416.927(e)(2), 416.946(c).

In assessing Plaintiff's RFC at step three of the §§404.1520/416.920 analysis, the ALJ relied upon, *inter alia*, the March 6, 2015 consultative evaluation results from Dr. Ellis, August 7, 2015 records from UMCNO, and December 18, 2015 records from Daughters of Charity following Plaintiff's vehicle-related accident two days earlier. The ALJ also considered records from TeamCare to which Plaintiff had been referred by her accident-related attorney. The Court recalls that when evaluated by Dr. Ellis, Plaintiff had a normal

18

range of motion of the neck and back, negative straight-leg raising bilaterally, and a reciprocal gait requiring no assistive devices.  Although she had a decreased range of motion to the left ankle along with some tenderness to palpation, muscle tone, bulk, and strength were preserved in all extremities with normal sensation and reflexes.  The diagnosis was mild peripheral neuropathy and left ankle pain but with unremarkable x-ray results.

In the months that followed, Plaintiff was treated for non-disabling gynecological issues and flu-like symptoms.  A physical examination that was performed on November 5, 2015 revealed Plaintiff's extremities to be normal and atraumatic with no cyanosis or edema.  On December 16, 2015, Plaintiff was involved in the accident described earlier, which undoubtedly resulted in injuries to her left side.  Although limping was observed in the immediate aftermath of the incident, sensation, motor strength, and reflexes were normal and x-rays taken shortly thereafter were negative for acute abnormalities.  Conservative treatment for Plaintiff's traumatic injuries began at TeamCare on January 8, 2016 following a diagnosis of a knee contusion, a sprained ligament in the left ankle, and pain in the left hip.  Plaintiff was seen at UMCNO on February 8, 2016 for complaints of ongoing and worsening paresthesia in the left arm and leg but a physical examination was largely unremarkable and the attending physician remarked that despite Plaintiff's history of neuropathy, she did not have any "… pertinent problems on file."  The assessment was paresthesia in the left arm and leg and Plaintiff was re-started on Neurontin.

Conservative treatment at TeamCare continued through February and March of 2016 which was successful in alleviating Plaintiff left hip and ankle pain and an MRI conducted around this time revealed only persistent edema in the knee.  Similar studies of the cervical spine were performed on April 11, 2016 which demonstrated mild diffuse congenital

narrowing of the spinal cord and only minimal to mild canal stenosis most pronounced at C3-4, as well as Type I endplate change at C4-5 with a posterior annular fissure. In the meantime, Plaintiff had discontinued treatment at TeamCare on April 6, 2016 after achieving "markedly decreased" discomfort to the left knee, hip, and ankle.

As observed by the ALJ, throughout the foregoing medical history none of Plaintiff's treating physicians placed any limitations upon her activities, a proper consideration in a Social Security proceeding. *Leggett v. Chater*, 67 F.3d 558, 565 (5th Cir. 1995); *Vaughan v. Shalala*, 58 F.3d 129, 131 (5th Cir. 1995). Similarly, with the exception of Dr. Kelly, who in a brief treatment note dated March 18, 2016 indicated that Plaintiff was incapable of work at that time, none of the other physicians who had treated or examined Plaintiff ever declared that she was disabled and unable to work.[4/] *Vaughan*, 58 F.3d at 131 (citing *Harper v. Sullivan*, 887 F.2d 92, 97 (5th Cir. 1989)). Faced with at least some of the evidence that would later be considered by the ALJ, the state agency medical consultants who reviewed Plaintiff's file at the first step of the administrative review process found that she did not even suffer from a severe impairment. (Tr. pp. 54-60, 61-67). The ALJ, on the other hand, in recognition of the later-generated evidence, found that Plaintiff suffered from a number of "severe" impairments but that she retained the RFC for a limited range of light work. That assessment was not unreasonable in light of the body of evidence that was before her.

Next, citing pages 366 and 367 of the administrative record, Plaintiff argues that the ALJ failed to factor into her RFC assessment diagnoses of major depressive disorder,

---

[4/] Even Dr. Kelly's sole declaration is not determinative in light of his modest clinical findings of only a reduced range of motion and pain to the left knee with conservative treatment to continue followed by a return clinic visit in four weeks. *Brunson v. Astrue*, 387 Fed.Appx. 459, 462 (5th Cir. 2010)(citing *Frank v. Blackburn*, 326 F.3d 618, 620 (5th Cir. 2003)).

psychosis, and PTSD that were made by Dr. Biswas of the New Orleans East Behavioral Health Center.  The fact that a claimant has been diagnosed with a condition, standing alone, does not establish disability.  *Bordelon v. Astrue*, 281 Fed.Appx. 418, 422 (5th Cir. 2008).  In fairness, the cited pages are the first two pages of an apparent six-page treatment note submitted by Plaintiff's attorney which documents a session not with Dr. Biswas, but with Dr. Jessica Clark of the aforementioned facility on April 18, 2016.  In that note, Dr. Clark admittedly referenced an earlier evaluation by Dr. Biswas that was performed on February 3, 2016 in which Plaintiff was diagnosed with major depressive disorder, psychosis, and PTSD and was started on medications.  Since that time, Dr. Clark reported that Plaintiff was feeling calmer with no depressive disorders, sleep problems, appetite or weight changes, delusions or anxiety, panic attacks, or further psychiatric symptoms.  Plaintiff was also fully oriented with good eye contact and an appropriate affect and she advised Dr. Clark that she exercised regularly.  In light of the great improvement that Plaintiff had experienced, she was to continue on her medication regimen and was to return in two months.  Contrary to the testimony that she later gave at the administrative hearing regarding medication non-compliance, the Regulations impose an affirmative duty upon Social Security claimants to follow the treatment prescribed by their physicians, 20 C.F.R. §§404.1530, 416.930, and a condition that can reasonably be remedied by surgery, treatment, or medications is not disabling.  *Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir. 1987).

The foregoing notwithstanding, the ALJ specifically considered and discussed the medical records cited by Plaintiff in the body of her written decision and concluded "… that while the claimant might be somewhat limited by her depression, the impact of those symptoms does not wholly compromise her ability to function independently, appropriately,

and effectively on a sustained basis." (Tr. p. 15). The limitation that the ALJ included in her RFC assessment requiring the performance of tasks that are simple, routine, and repetitive adequately accounted for Plaintiff's non-exertional impairments.

Finally, Plaintiff argues that the ALJ's RFC assessment was flawed because she relied upon only x-rays and stale EMG results and failed to discuss or evaluate MRI findings, ongoing pain management, or any records whatsoever from exhibit No. 17F in violation of SSR 96-8p. A fair reading of the ALJ's decision does not bear this out.

At the outset of her written decision in the present case, the ALJ stated as follows:

> During the hearing, Exhibits 1A through 14F were admitted into evidence without objection. Subsequent to the hearing, additional evidence was received by the agency from Daughters of Charity (*Exhibit* 15F), Dr. Danita Anderson (*Exhibits* 16F and 18F) and University Medical Center (UMC)(*Exhibit* 17F). This evidence was received, entered into the record, reviewed and considered in this decision.

(Tr. p. 11)(emphasis added).

As argued by the Commissioner, the fact that an ALJ cites certain evidence that she felt supported her decision does not mean that she failed to consider all of the other evidence in the record. *Brunson v. Astrue*, 387 Fed.Appx. 459, 461 (5th Cir. 2010); *Castillo v. Barnhart*, 151 Fed.Appx. 334, 335 (5th Cir. 2005); *Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994). In *Brunson*, for example, the Fifth Circuit found the ALJ's review to have been sufficient where his decision stated that it was made "[a]fter careful consideration of all the evidence, ..." *Brunson*, 387 Fed.Appx. at 461.

On no fewer than four separate occasions in the body of her written decision, the ALJ explicitly stated that it was being made after careful consideration of "all the evidence" or after careful consideration of the "entire record," representations that the Court is ill-suited to second-guess. (Tr. pp. 12, 13, 15). Then, in discussing the evidence supporting her RFC

assessment, the ALJ specifically cited exhibit No. 11F, p. 17 which, in turn, includes reference to the results of an MRI that was performed on March 17, 2016. (Tr. p. 18). It being fairly established that the ALJ did, in fact, consider all of the evidence of record, the mandates of Social Security Ruling ("SSR") 96-8p have been sufficiently complied with. *Porter v. Barnhart*, 200 Fed.Appx. 317, 319 (5th Cir. 2006). And as further made clear in SSR 96-8p, inherent in the ALJ's RFC assessment is a finding that the Plaintiff could perform work on a regular and continuing basis. *Crossgrow v. Astrue*, No. 12-CV-2052, 2013 WL 5507280 at *16 (E.D. La. Sept. 30, 2013)(citing SSR 96-8p, 1996 WL 374184 at *1-2). However, even if it could be said that the ALJ failed to adequately discuss the medical records admitted as exhibit No. 17F, Plaintiff was not prejudiced by that omission because the result of the administrative proceeding would have been no different. *Daunie v. Berryhill*, No. 16-CV-12782, 2017 WL 3432612 at *13 (E.D. La. June 29, 2017), *adopted*, 2017 WL 3425468 (E.D. La. Aug. 9, 2017).

Exhibit No. 17F consists of medical records documenting Plaintiff's treatment at UMCNO on three occasions in the winter and spring of 2016. On the first occasion, February 8, 2016, Plaintiff presented with complaints of left upper and lower extremity paresthesia which had started in 2008 but had become progressively worse, resulting in significant difficulty in walking and requiring multiple pillows under her leg to be comfortable when sleeping. On this treatment note, Plaintiff's employer was identified as Domino's Pizza. Upon physical examination, Plaintiff had normal muscle bulk and overall muscle tone; strength was 5/5 throughout except for 4/5 in the left biceps, triceps, quadriceps, hamstring, anterior and posterior tibial, peroneal, and gastroc. A sensory exam was normal and Plaintiff's gait was non-neurologic. The assessment was paresthesia of the left arm and leg. An MRI of the

cervical spine was ordered, Gabapentin was prescribed, and Plaintiff was to return to the clinic in three months.

Plaintiff was seen again at UMCNO on March 24, 2016 for follow-up care of her dysmenorrhea. She reported improvement with her pain when she was taking birth control pills which she unfortunately had to discontinue due to interference with her bipolar disorder medication. However, she also reported pain relief when taking the Gabapentin that had been prescribed for her neuropathy. Otherwise, Plaintiff took only over-the-counter medications as needed for pain. The assessment was follow-up for endometriosis and a transvaginal ultrasound which produced unremarkable results. The placement of a Mirena IUD was discussed and Plaintiff was to consult with a neurologist for further neuropathy follow-up.

Finally, on April 11, 2016, Plaintiff returned to UMCNO to undergo an MRI of the cervical spine without contrast. Domino's Pizza continued to be identified as her employer on the records from this date. That study revealed mild diffuse congenital narrowing of the spinal cord which, when coupled with Plaintiff's mild spondylosis, caused minimal to mild canal stenosis. The results of these three clinic visits, one of which pertained to a condition that was not even alleged by Plaintiff to be disabling, were not significant enough to have altered the ALJ's conclusion that Plaintiff was capable of performing a limited range of light-level work. *Clayborne v. Astrue*, 260 Fed.Appx. 735, 737 (5th Cir. 2008); *Adams v. Bowen*, 833 F.2d 509, 512 (5th Cir. 1987). Plaintiff's first challenge provides no basis to disturb the Commissioner's decision.

In her second challenge to the Commissioner's decision, Plaintiff argues that the ALJ failed to apply the appropriate legal standard as set forth in SSR 16-3p in determining her

credibility regarding pain and other symptoms.  In advancing this challenge, Plaintiff first argues that the ALJ shouldered her with the improper burden of proving that she is incapable of <u>all</u> work activities rather than merely demonstrating "… that she is unable to engage in any substantial gainful activity by reason of her medical impairments …"  (Rec. doc. 16-2, p. 9). In addressing this contention, the Court simply notes that at the outset of her written decision, the ALJ framed the overall issue as "… whether the claimant is disabled under … the Social Security Act," with "[d]isability … [being] defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairments or combination of impairments that … has lasted or can be expected to last for a continuous period of not less than 12 months."  (Tr. p. 11).  Then, in summarizing the five-step sequential analysis set forth in §§404.1520/416.920, the ALJ properly recited the inquiry that is made at the fifth step as to whether she was capable of doing "other work" as defined by §§404.1520(g) and 416.920(g).  (Tr. p. 13).  Clearly, the ALJ did not impose an improper burden of proof upon Plaintiff.

Next, Plaintiff complains that the ALJ's findings concerning the disabling effects of her pain and other limitations failed to comport with the Regulations as "… the ALJ failed to clearly articulate and follow … [the] two-step process … in SSR 16-3p."  (Rec. doc. 16-2, p. 10).  That two-step is defined as follows:

> First, we must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms, such as pain.  Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms is established, we evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities for an adult or to function independently, appropriately, and effectively in an age-appropriate manner for a child with a title XVI disability claim.

SSR 16-3p, 2017 WL 5180304
at *3 (Oct. 25, 2017).

As another section of the court has noted, "... SSR [16-3p] generally tracks the statutory language of 20 C.F.R. §§404.1529 & 416.929, including setting forth the two-step process for evaluating symptoms: whether the individual has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms; and the extent to which, given the intensity and persistence of symptoms such as pain, the symptoms limit an individual's ability to perform work-related activities for an adult, or function for a child. *Shaffett v. Soc. Sec. Admin.*, No. 15-CV-5452, 2016 WL 8669757 at *6 (E.D. La. Sept. 30, 2016)(footnote omitted), *adopted*, 2017 WL 1149334 (E.D. La. Mar. 27, 2017).

Before discussing the medical evidence upon which her RFC assessment of Plaintiff was based, the ALJ cited the following guiding principles:

> In making this finding, I have considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSR 96-4p. I have also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p.

> In considering the claimant's symptoms, I must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)—i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques—that could reasonably be expected to produce the claimant's pain or other symptoms.

> Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, I must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functioning. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, I must consider other evidence in the record to determine if the claimant's symptoms limit the ability to do work-related activities.

The claimant is a younger individual with a 12th grade education and 2 years of college experience and past relevant work as a cashier, assistant manager, sales route deliver[y] driver, caregiver, pizza baker and fashion accessory salesperson who alleged disability due to neuropathy. However, after careful consideration of the evidence, I find that while the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; her statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

(Tr. p. 16).

Although the ALJ failed to specifically cite SSR 16-3p, she did reference 20 C.F.R. §§404.1529 and 416.929, the Regulations upon which the SSR is based. Contrary to Plaintiff's present contention, a review of that Ruling and the ALJ's written decision readily reveals that she sufficiently articulated and followed the two-step process set forth in SSR 16-3p. Plaintiff also faults the ALJ for "... fail[ing] to consider all of the objective evidence like the MRI and clinic visits to Daughters of Charity." (Rec. doc. 16-2, p. 10). In terms of MRI results, the ALJ did cite to exhibit No. 11F(17), which discusses the results of one of the two such diagnostic tests that were conducted in this case, a March 17, 2016 MRI that was performed at the behest of DC Kern to better diagnose the traumatic orthopedic injuries that Plaintiff suffered in her vehicle-related accident. That testing demonstrated only persistent edema in the left knee. Although the second MRI of record, the one of the cervical spine that was performed on April 11, 2016, was admittedly not discussed by the ALJ, it revealed only minimal to mild canal stenosis which would not preclude the performance of all substantial gainful activity. As for the Daughters of Charity records, the record reveals that Plaintiff was seen at that facility on five occasions between February 4, 2015 and December 18, 2015. Of those five visits, three were for gynecological-related issues. Plaintiff's fifth and final visit to

27

that facility was precipitated by the traumatic automobile accident several days earlier and resulted in only a diagnosis of osteoarthritis.  In any event, at least two of Plaintiff's visits to Daughters of Charity were specifically discussed by the ALJ (tr. pp. 17-18) and the result of the administrative proceeding would have been no different had the results of the other visits been discussed more fully.

At the end of the day, the medical records admitted in the administrative proceeding below document a total of approximately 29 occasions on which Plaintiff underwent medical treatment, evaluation, or testing.  Of those 29, on only two occasions was the treatment specifically related to the sole condition upon which Plaintiff predicated her disability: neuropathy.  On December 17, 2015, Plaintiff was seen at Daughters of Charity for left leg pain and flu-like symptoms.  The diagnosis was neuralgia of the left lower extremity and no limitations were placed upon her activities.  On the second occasion, February 8, 2016, Plaintiff was evaluated at UMCNO for complaints of left lower and upper extremity paresthesia.  The results of a physical examination, however, were largely unremarkable and once again no limitations were placed on Plaintiff's activities.  By contrast, the records document multiple occasions on which Plaintiff was seen for conditions that were not alleged to be disabling:  seven occasions on which she was seen for gynecological issues, six on which she was evaluated and/or treated for her accident-related orthopedic injuries, and four on which she received eye care.  The sparsity of neuropathy-related treatment records detracts from that condition being disabling to the extent alleged.  *Villa*, 895 F.2d at 1024.  As for Plaintiff's present suggestion that she lacked the financial fortitude to afford treatment, there is no evidence that she would be disabled with or without regular medical treatment, *id.*, and the Court cannot help but note that she herself "discontinued" treatment at TeamCare for

her orthopedic injuries despite the fact that it was apparently being paid for by her attorney. (Tr. pp. 349-354).

Subjective complaints of pain and other limitations must be corroborated by the objective medical evidence of record. *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001). On that point, the ALJ concluded as follows:

> After a review of the entire record, the undersigned is not persuaded by the claimant's allegation that the severity of functional limitation imposed by her impairments precludes the performance of all work activities. The claimant alleged disability due to neuropathy and while prior EMG/NCS confirm mild peripheral polyneuropathy of a primarily sensory type, affecting both lower extremities. (*See Exhibit* 2F); there is nothing in the evidence to support the claimant's allegations of severe functional limitations such that she would be precluded from the performance of all work activity. At the time the claimant elected to discontinue treatment with Dr. Kelly, in April 2016, he noted that her discomfort in the left knee, hip and ankle were markedly reduced (*See Exhibit* 11F17).

> The record does not contain any evidence from treating or examining physicians indicating that the claimant is disabled or even has limitations greater than those determined in this decision. Furthermore, there are no clinical, diagnostic or laboratory findings to corroborate the severity of impairments alleged. X-ray imaging of the left knee and femur taken in December 2015 revealed no radiographic evidence of an acute abnormality, no fracture or dislocation and no joint space narrowing (*See Exhibit* 10F1-2). Likewise, there is not a longitudinal treatment history for her pain symptoms that one would typically expect for a totally disabled individual as the claimant voluntarily elected to discontinue treatment for her pain symptoms, which according to treating notes had improved with physiotherapy.

(Tr. p. 18).

The responsibility of weighing the evidence and determining the credibility of witnesses' testimony and doctors' opinions lies with the ALJ in the first instance. *Carrier v. Sullivan*, 944 F.2d 243, 247 (5th Cir. 1991); *Griego v. Sullivan*, 940 F.2d 942, 945 (5th Cir. 1991); *Wren v. Sullivan*, 925 F.2d 123, 129 (5th Cir. 1991); *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990). "Credibility conclusions are 'precisely the kinds of determinations that

the ALJ is best positioned to make,'" *Spruill v. Astrue*, 299 Fed.Appx. 356, 358 (5th Cir. 2008)(quoting *Falco*, 27 F.3d at 164), and such determinations are entitled to considerable deference here. *McKnight v. Astrue*, 340 Fed.Appx. 176, 181 (5th Cir. 2009). As was done in the present case, "[t]he ALJ's explanation of her reasons for finding plaintiff not entirely credible is all that is required." *Daunie*, 2017 WL 3432612 at *14 (citations omitted). In light of these authorities, it will be recommended that Plaintiff's motion for summary judgment be denied, that Defendant's motion for summary judgment be granted, and that Plaintiff's suit be dismissed.

<u>**RECOMMENDATION**</u>

For the foregoing reasons, it is recommended that Plaintiff's motion for summary judgment be denied, that Defendant's motion for summary judgment be granted, and that Plaintiff's suit be dismissed.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within 14 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. *Douglass v. United States Auto. Assoc.*, 79 F.3d 1415 (5th Cir. 1996)(en banc).[5]

---

[5] *Douglass* referenced the previously-applicable 10-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. §636(b)(1) was amended to extend that period to 14 days.

New Orleans, Louisiana, this __17th__ day of _____May_____ 2018.

_____
MICHAEL B. NORTH
UNITED STATES MAGISTRATE JUDGE